UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT COMPEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C. 5835 |
| v. | ) | |
| | ) | Magistrate Judge Nolan |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Compean filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act").[1] 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Mr. Compean filed a motion for judgment on the pleadings and the Commissioner filed a cross-motion for summary judgment. For the reasons stated below, Mr. Compean's motion is denied, the Commissioner's motion is granted, and the final decision of the Commissioner of Social Security is affirmed.

## PROCEDURAL HISTORY

Mr. Compean applied for DIB and SSI on October 16, 2006, alleging he became disabled because of congestive heart failure, sleep apnea, a brain aneurysm, diabetes, high blood pressure, high cholesterol, and an intracerebral hemorrhage. (R. at 126-131, 132-134, 144). He alleged these impairments caused him to have memory problems, weakness in his legs, disorientation, an inability to lift heavy objects, and an inability to get up quickly. (R. at 147).

---

[1] Mr. Compean initially applied for Disability Insurance Benefits ("DIB") in addition to SSI benefits. On July 20, 2009, the Appeals Council denied Mr. Compean's request for review of the ALJ's decision to deny him disability insurance benefits. (R. 28-30). Mr. Compean does not challenge the ALJ's decision with respect to the DIB claims. (Doc. 20 at 1 n. 1). Therefore, the only issues before the Court are those that relate to Mr. Compean's SSI claim.

The applications were denied initially and on reconsideration, after which Mr. Compean filed a timely request for a hearing. (R. at 75-82, 101-108, 110-114). On April 22, 2008, Mr. Compean, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 5-22). The ALJ also heard testimony from Lee Newton, a vocational expert ("VE"). (R. at 22-27). On December 16, 2008, the ALJ found that Mr. Compean was not disabled because he could perform a significant number of jobs in the national economy. (R. at 60-70). On July 20, 2009, the Appeals Council issued a partially favorable decision, finding Mr. Compean disabled as of, but not prior to, June 25, 2008 (his 50th birthday). (R. at 31-38). Mr. Compean now seeks judicial review of the Appeals Council's determination that he was not disabled from October 16, 2006 (the date of his application) to June 24, 2008, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Mr. Compean was born on June 26, 1958. (R. at 20). He testified that he does not have a high school diploma or GED. (R. at 5). Mr. Compean explained that he worked as a dock man and spotter prior to the onset of his impairments and operated equipment such as spotting trucks and forklifts. (R. at 7-8).

### A.    Medical Evidence

On December 1, 2004, Mr. Compean visited Dr. K. Ahmed and was diagnosed with chronic obstructive pulmonary disease ("COPD"). (R. at 642). Dr. Ahmed noted that Mr. Compean had dyspnea (shortness of breath) after walking less than 100 yards. Id.

### 1.    Intracerebral Hemorrhage Hospitalization

On July 27, 2006, Mr. Compean was admitted to MacNeal Hospital in Berwyn, Illinois complaining of headaches and a stiff neck. (R. at 647-49). After a CT scan, Mr. Compean was diagnosed with an intracerebral hemorrhage due to hypertension. (R. at 647). Dr. Calvin Wadley noted a history of congestive heart failure and hypertension. (R. at 648). Dr. Wadley's neurological assessment described Mr. Compean as "alert," with cranial nerve and motor functions intact, no

focal extremity weakness, and no pronator drift. (R. at 648). On July 31, 2006, Mr. Compean was transferred from MacNeal Hospital to Northwestern Memorial Hospital at a doctor's request. (R. at 447).

During his stay at Northwestern Memorial Hospital, Mr. Compean was treated for a variety of impairments. An August 1, 2006 neurological consultation performed by Dr. Rajeev Garg indicated Mr. Compean had impaired alertness, speech, and attention. (R. at 429-33). Specifically, Dr. Garg noted Mr. Compean was "remarkable for worsened encephalopathy (due to bicerebral dysfunction) and left medial rectus palsy." (R. at 432). On August 2, 2006, an electroencephalography test indicated abnormal results due to focal left frontal slowing, which Dr. Garg stated was consistent with mild focal cerebral dysfunction. (R. at 504).

An August 3, 2006 speech pathology evaluation by speech-language therapist Kristin Larsen noted that Mr. Compean had memory deficits. (R. at 294-95). Ms. Larsen noted that Mr. Compean had "mild-moderate cognitive communication difficulties characterized by reduced short-term memory, difficulty with problem-solving, and reduced auditory processing." (R. at 294). The long-term goals of speech therapy for Mr. Compean were to "stabilize cognitive-communication skills for functional activities of daily life." (R. at 295).

Kathleen Schmidt performed a diabetes consultation with Mr. Compean on August 3, 2006. (R. at 413-14). The record does not indicate Ms. Schmidt's job title. Ms. Schmidt recommended a treatment plan of 25 units of Lantus, blood sugar checks before meals and at bedtime with coverage per medium dose Novolog scale for sugars greater than 150 mg/dl, and prandial Novolog insulin 3 units with meals once tolerating oral intake. (R. at 414). That same day, Dr. Bernard Bendok noted that Mr. Compean was seven days post intraventricular hemorrhage and "neurologically intact." (R. at 445).

On August 4, 2006, a sleep study was conducted by Dr. Lisa Wolf. (R. at 506). The study confirmed Mr. Compean's diagnosis of obstructive sleep apnea ("OSA"). Id. The report indicated

that a nasal CPAP device was required due to the severity of Mr. Compean's OSA. Id. In addition, the report noted that "[p]ersons with excessive daytime sleepiness may be at an increased risk for motor vehicle accidents." Id.

On August 7, 2006, Kristin Larsen conducted another series of cognitive evaluations on Mr. Compean. (R. at 551-52). Mr. Compean initially had a 0% accuracy rate on a short-term memory evaluation. (R. at 551). Ms. Larsen noted he was oriented to person and place but "not consistently oriented to time." Id. Mr. Compean had a 30% accuracy rate to follow 3-step direction with no repetition. Id. Mr. Compean reported that while he has always had some problems with short-term memory, he was near baseline with multi-step directions. Id. Ms. Larsen presented Mr. Compean with a few strategies such as rehearsal and written cues to compensate for his decreased short-term memory. Id. Mr. Compean's accuracy increased to 100% on the recall list of 3 words after short delay after the discussion of the rehearsal/association strategies. (R. at 552). Ms. Larsen noted that the long-term goal of the therapy was to "stabilize cognitive-communication skills for functional activities of daily living." Id.

On August 8, 2006, another diabetes consultation performed by Elyssa Springer, an Advanced Practice Nurse, noted that Mr. Compean verbalized depression and felt overwhelmed by his health issues. (R. at 202). Ms. Springer's assessment of Mr. Compean listed a diagnoses of Type 2 diabetes. (R. 203). She presented him with a course of treatment involving insulin monitoring, diet, exercise, and diabetes education. Id. An August 8, 2006, neurological assessment indicated Mr. Compean was "within normal limits." (R. at 522). On August 8, 2006 Mr. Compean was discharged from Northwestern Memorial Hospital. (R. at 198).

## 2. Second MacNeal Hospitalization

On August 9, 2006, one day after discharge from Northwestern Memorial Hospital, Mr. Compean was again admitted to MacNeal Hospital in Berwyn complaining of dizziness. (R. at 617). While admitted or being admitted, Mr. Compean's daughter checked a box in response to a nursing

admission history questionnaire which stated he was not "currently experiencing difficulty in concentration, disorientation/confusion, lethargy or social withdrawal." (R. at 621). An August 9, 2006 computerized tomography exam revealed Mr. Compean's hemorrhage had decreased slightly in size since the July 31, 2006 computerized tomography exam. (R. at 638).

An August 10, 2006 MacNeal assessment form listed Mr. Compean as oriented to person, place, and time as well as able to follow simple commands and speak appropriately. (R. at 626). Memory problems were not observed or reported on that form. Id. On August 15, 2006, Mr. Compean underwent another CT scan, which was evaluated by Dr. Stephen F. Futterer. (R. 204-05). The scan revealed the hemorrhage had progressed as expected without overt hydrocephalus.[2] (R. at 204). An August 15, 2006 progress note by Dr. Peter Lee stated that Mr. Compean was asymptomatic and without complaints after being admitted. (R. at 206). Dr. Lee noted that Mr. Compean was neurologically stable after his latest fainting episode and his CT scan appeared stable compared to prior scans. (R. at 207).

### 3. Other Medical Records

In November 2006, Mr. Compean complained of neck pain. (R. 738). A radiological exam reveal no obvious fracture or dislocation as well as intervertebral disk spaces well preserved. Id. On November 17, 2006, Mr. Compean visited the Eerie Family Medical Center complaining of numbness and tingling in his left hand. (R. at 687). He was diagnosed with degenerative arthritis in his spine. (R. at 687).

On December 18, 2006, Dr. Peter Biale performed a consultative exam. (R. at 667). The exam last for 30 minutes and reviewed Mr. Compean's vital signs, general appearance, skin, head, eyes, ears, nose, throat, neck, lungs, cardiac functioning, back, abdomen, peripheral pulses,

---

[2] "Hydrocephalus" is the excessive accumulation of cerebrospinal fluid within the cranium. http://www.nlm.nih.gov/cgi/mesh/2011/MB_cgi

extremities, musculoskeletal status, neurological status, and mental status. (R. at 667-70). In his clinical impressions, Dr. Biale opined that Mr. Compean does not have any gross neurological deficits, except for being Romberg positive (indicating a balance impairment). (R. at 670). Dr. Biale found that Mr. Compean had diabetes mellitus Type 2, hypertension, congestive heart failure, obesity (Mr. Compean was 67" tall and weighed over 350 pounds at the time), sleep apnea, and hypercholesterolemia. (R. at 669-70). Dr. Biale noted "no apparent mood or thought disorder." (R. 668). At the time of the consultative exam, Mr. Compean was taking the following medications: Furosemide, Metoprolol, Metformin, Enalapril, Amitriptyline. (R. at 667). In his mental examination, Dr. Biale found Mr. Compean to be "alert and oriented times three". (R. at 669). Dr. Biale opined that Mr. Compean's recent and remote memory was "intact." Id. Dr. Biale further opined that Mr. Compean was able to concentrate and maintain attention span. Id.

On January 3, 2007, Dr. Virgilio Pilapil reviewed Mr. Compean's medical records to determine Mr. Compean's RFC. (R. at 671-78). Dr. Pilapil opined that Mr. Compean could occasionally lift 20 pounds, frequently lift ten pounds, stand and/or walk at least two hours in an eight-hour day, sit about six hours in an eight-hour day, push and/or pull unlimited, and occasionally climb ramps and stairs, balance, stoop, knell, crouch, and crawl, but could never climb ladders, ropes, or scaffolds, and needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and work hazards such as machinery and heights. (R. 672-75). Dr. Pilapil stated:

> [Mr. Compean] is 48 years of age and is morbidly obese. There is history of bleeding aneurysm, but neurologic exam is within normal limits, except positive Romberg. His is able to bear weight and ambulate unassisted with normal gait. The finger grasp and hand grip are unimpaired bilaterally. The motor strength in the lower extremities is (5/5) intact. There is full range of motion in back and extremities, with normal lumbar curvature, and no spasms or tenderness. There appears to be fluid retention, and claimant complains of shortness of breath on minor exertion. The cardiac exam revealed normal S1, S2, without murmurs or clicks. The lungs are clear, with no evidence of wheezing, rales, or rhonchi, and good airway entry. There was no clubbing or cyanosis. This individual can perform a sedentary level exertion.

(R. 678). On March 22, 2007, Dr. Robert Patey reviewed Mr. Compean's medical records and

agreed with Dr. Pilapil's RFC findings. (R. at 700-02). On May 22, 2007, Mr. Compean complained of tingling and burning in his feet and symptoms extending into the thigh with ambulation for two to three blocks. (R. 721). In December 2007, Mr. Compean's doctor noted that his hypertension was "well controlled" and his diabetes was controlled with medication. (R. 708).

## B.    Mr. Compean's Testimony

On April 22, 2008, Mr. Compean testified at a hearing before an ALJ. (R. at 3). Mr. Compean testified that he "once in a while" will have sharp chest pains. (R. at 8). He testified the only residual problem from his 2006 intracranial hemorrhage was a "lack of memory." (R. at 9). Mr. Compean testified that he has trouble remembering things such as birthdays and phone numbers since the hemorrhage. (R. at 18).

Mr. Compean occasionally has poor circulation in his extremities. (R. at 9). He testified that since 2007, he has neck pains due to arthritis of the spine. Id. Mr. Compean elevates his legs when he sleeps and sits in a recliner to ease the throbbing in his legs. (R. at 13).

Mr. Compean testified he can walk about two blocks before feeling pain in his legs, the bottom of his feet, and a throbbing in his knee. (R. at 9-10). Mr. Compean has non-insulin dependent diabetes. (R. at 10). He can stand for an hour, but that exertion will cause throbbing in his feet in the evening. Id. He can sit for an hour or two before he has to stand due to poor circulation. Id. Mr. Compean can lift 100 to 180 pounds once and walk two blocks with groceries. (R. at 10-11).

Mr. Compean stated that he has difficulty climbing stairs. (R. at 11). He frequently climbs up and down stairs to help his mother, who lives on the second floor. (R. at 11-12). He can bend, stoop, crouch, crawl, and kneel, but feels minor pain in his joints after the exertion. (R. at 12). Mr. Compean has no problem with balance, reaching, or using his hands. Id.

Mr. Compean testified he has difficulty sleeping at night and can sleep for only three to four hours at a time. (R. at 12). He nods off "once in a while" during the day, especially when he is not

doing any activity.  (R. at 11-12).  Mr. Compean testified that he took part in a sleep study.  (R. at 8).  He did not have a CPAP machine to treat sleep apnea at the time of the hearing but he was scheduled to get one on May 7, 2008.  Id.  Mr. Compean testified that he had been  waiting for a CPAP machine for his sleep apnea for four years.  (R. at 21).  Mr. Compean testified that the majority of the times he sits down to watch television he falls asleep.  (R. at 19).

Mr. Compean has no difficulty with personal care.  (R. at 13).  He performs household activities such as cooking, grocery shopping, washing dishes, laundry, vacuuming, dusting, mopping, and sweeping.  (R. at 13-14).  He does not shovel snow on his doctor's suggestion.  (R. at 14).   At the time of the hearing, Mr. Compean did not do yard work but was considering doing it in the future.  Id.  His hobbies include fishing and antique collecting, which he had done within the two years prior to the hearing.  (R. at 15).  Mr. Compean occasionally attends social events if he is invited.  (R. at 16).

Mr. Compean explained that he typically wakes up around 8:00 a.m. and makes  breakfast. (R. at 16).  He then walks around the house and outside looking for chores to do in order to keep himself busy.  Id.  If Mr. Compean is not active, he will fall asleep. (R. at 16-17).  He testified he began to feel more aches and pains when he lost his car and had to walk more. (R. at 17).  Mr. Compean goes to bed around 11:00 p.m. to 11:30 p.m.  Id.  He wakes up between 2:00 a.m. and 3:00 a.m. and again at 6:00 a.m. before waking up for the morning at 8:00 a.m.  Id.

C.    **Vocational Expert Testimony**

Lee Newton testified at the hearing as a Vocational Expert ("VE").  He testified that Mr. Compean's past work consisted of being a spotter and a material handler.  (R. at 23).  Mr. Newton explained that a spotter is a semiskilled and medium physical demand job, while a material handler is a semiskilled and heavy physical demand job.  Id.  The VE stated that none of those skills would be transferrable to light or sedentary work.  Id.

The ALJ then asked the VE a hypothetical question about what kinds of jobs would be available to an individual with Mr. Compean's age, education, work experience, light work restrictions–including never climbing and only occasional balancing, stooping, crouching, kneeling, and crawling, and avoiding exposure to lung irritants and work hazards. (R. at 23). The VE testified that such an individual would not be able to perform Mr. Compean's past work, but there were some jobs that could be performed. (R. at 23-24). The ALJ then asked about sedentary jobs with a sit/stand option at will. (R. at 24). The VE testified there would be about 3,200 jobs in the Chicago-metro area that were sedentary with a sit/stand option at will. (R. at 24). He testified that there would be about 2,000 light jobs with a sit/stand option at will, mainly parking attendants. (R. at 24-25).

The VE testified that an individual who had to take unscheduled naps would not be employable. (R. at 25). He also testified that an individual who had to elevate his legs would not be employable locally or nationally. Id. The VE stated that a person needs to focus on the job 85-95% of the time to remain employable, and that an employee with short-term memory problems such that the employee was off-task 10% of the time would be only marginally employable. (R. at 26). Further, he testified that someone who is tardy or absent 10% of the time (about two days a month) or more would not able to sustain employment. Id.

D.    **The ALJ's and Appeals Council's Decisions**

1.    **The ALJ's Decision**

The ALJ denied Mr. Compean's request for benefits on December 16, 2008. (R. at 60-70). Applying the five-step sequential evaluation process, the ALJ found at step one, that Mr. Compean was not engaged in substantial gainful activity since June 26, 1998, his alleged onset date. (R. at 65). At step two, the ALJ found that Mr. Compean's severe impairments consist of congestive heart failure, chronic obstructive pulmonary diseases, hypertension, diabetes mellitus, cervical arthritis

and obesity.  Id.  At step three, the ALJ determined that Mr. Compean's impairments do not meet or medically equal the severity of any of the listings enumerated in the regulations.  (R. at 65-66).

The ALJ then assessed Mr. Compean's residual functional capacity ("RFC"), which is  the maximum he can still do despite his mental and physical limitations.  Craft v. Astrue, 539 F.3d 668, 675-76 (7th Cir. 2008).  The ALJ determined that Mr. Compean has the RFC to perform sedentary work with the exception that Mr. Compean needs to be able to sit/stand at will and avoid concentrated exposure to lung irritants and work hazards.  (R. at 66-67).  Based on Mr. Compean's RFC and the VE's testimony, the ALJ determined at step four that Mr. Compean could not perform any past relevant work.  (R. at 68).  At step five, the ALJ found that jobs exist in significant numbers in the national economy which Mr. Compean can perform, including work as a handpacker, inspector, order clerk, and bench assembler.  (R. at 69-70).  Accordingly, the ALJ concluded that Mr. Compean was not suffering from a disability as defined by the Act.  (R. at 69-70).

### 2.      The Appeals Council Decision

The Appeals Council reviewed the ALJ's decision on July 25, 2009 as to Mr. Compean's claim for SSI.  (R. at 35-39).  The Appeals Council adopted the ALJ's findings at steps 1 through 4 as well as her finding that Mr. Compean is limited to sedentary work.  (R. 36).  The Appeal Council affirmed the ALJ's finding that Mr. Compean was not disabled for the period before June 25, 2008.  (R. 37).  The Appeals Council did not adopt the ALJ's findings or conclusions regarding whether Mr. Compean was disabled for the period beginning June 25, 2008, his 50th birthday.  Id.  The Appeals Council found that Mr. Compean was disabled for the period beginning June 25, 2008.  Id.

### DISCUSSION

Because the Appeals Council granted Mr. Compean's request for review, its ruling is the final decision of the Commissioner of Social Security.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).  Mr. Compean challenges the Appeals Council's decision finding him not disabled during the time

period between October 16, 2006 (when Mr. Compean applied for benefits) and June 24, 2008 (the day prior to his 50th birthday).

## A.     The Five-Step Evaluation Process

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that he or she is disabled within the meaning of the Act.[3] Keener v. Astrue, 2008 WL 687132, at *1 (S.D. Ill.2008); York v. Massanari, 155 F.Supp.2d 973, 977 (N.D. Ill.2001). A person is disabled when he or she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? (5) Is the claimant unable to perform any other work? See 20 C.F.R. § 416.920; Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that the claimant is not disabled." Zalewski v. Heckler, 760 F.2d 160, 162 n. 2 (7th Cir.1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." Clifford, 227 F.3d at 868.

## B.     Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. See 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Mr. Compean is severely impaired as defined by the Social Security

---

[3] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 *et seq*.

Regulations. Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." Id. The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." Id. (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." Indoranto v. Barnhart, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002) (internal citation and brackets omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." Young, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).

## C.    Analysis

Mr. Compean presents three arguments for why the Appeals Council decision denying him benefits for the period prior to June 25, 2008 should be overturned: (1) the ALJ failed to create a logical bridge between the evidence and her RFC and credibility findings; (2) the ALJ failed to adequately articulate her credibility determination; and (3) the ALJ was required to order additional consultative examinations. The Court addresses each of Mr. Compean's arguments in turn below.[4]

---

[4]  Because the Appeals Council adopted the ALJ's findings and rationale with respect to the first four steps of the sequential evaluation as well as the ALJ's finding that Mr. Compean was not disabled for the period before June 25, 2008, reference is made to the ALJ's decision except as otherwise noted.

## 1.     Residual Functional Capacity Assessment

Mr. Compean argues that the ALJ did not provide a logical bridge between the evidence and her RFC finding.  Mr. Compean criticizes the ALJ's decision as containing "a very limited discussion of the evidence specific to this case."  (Doc. 20 at 9).  Significantly, Mr. Compean does not indicate what specific pieces of evidence relevant to the RFC determination were ignored.

Although an ALJ must build an accurate and logical bridge from the evidence to her conclusions, the ALJ need not provide "a complete written evaluation of every piece of testimony and evidence."  Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005).  Rather, the ALJ need only "minimally articulate" her reasoning so as to connect the evidence to her conclusions.  Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004).   An ALJ may not ignore a line of evidence contrary to her ruling.  Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003).

The ALJ found that Mr. Compean retained the residual functional capacity to perform a limited range of sedentary work.  Sedentary work involves:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).  The ALJ concluded Mr. Compean could perform sedentary work, except that he needs to have a sit/stand option at will and to avoid concentrated exposure to lung irritants and work hazards.  (R. 66).

The ALJ provided adequate justification and reasoning for her RFC findings, which are supported by substantial evidence in the record.  First, the ALJ expressly adopted the opinion of the state agency physician (Dr. Virgilio Pilapil) who opined that Mr. Compean could perform sedentary work (R. 671-78), with additional limitations of a sit/stand option at will and avoiding concentrated exposure to lung irritants and work hazards.  (R. 68).  The only RFC assessment for Mr. Compean was provided by the state agency physicians.   Dr. Pilapil concluded that Mr.

Compean could perform sedentary work. (671-78). Dr. Patey affirmed Dr. Pilapil's assessment. (R. 700-02). The ALJ was entitled to rely upon the opinion of the state agency physician, particularly where no physician imposed any greater functional limitations than those found by the ALJ in her RFC determination. 20 C.F.R. § 416.920(f)(2)(i); Rice, 384 F.3d at 370 (holding ALJ did not err in relying on opinions from state agency consultants where there was "no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.").

Next, in her step three discussion, the ALJ noted that the medical records show that Mr. Compean can ambulate effectively, has good pulmonary and cardiovascular function, and no demonstrative visual, motor, or blood problems considering his diabetes. (R. 66); see also Rice, 384 F.3d at 370 n.5 (considering the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five). The ALJ further noted that Mr. Compean was 68 inches tall and weighed 373 pounds, has chronic obstructive pulmonary disease, and a history of smoking 1 pack of cigarettes daily for 20 years. Id. The ALJ also referenced pulmonary function tests conducted in December 2004 and noted the FEV1 and FVC test results, which failed to satisfy the criteria of Listing 3.02. Id.

The ALJ then accurately summarized in detail the report from Dr. Biale dated December 18, 2006, specifically mentioning Mr. Compean's history of diabetes, hypertension, congestive heart failure, brain aneurysm, and sleep apnea. The ALJ noted Dr. Biale's findings of diabetes treated with oral medication and no history of retinopathy, coronary artery disease, nephropathy, or diabetic ketoacidosis hospital admissions; hypertension for one year with current blood pressure readings within normal limits; shortness of breath with minor exertion and fluid retention; normal neurological exam save Romberg; obesity with full range of motion of all joints. Id. The ALJ explained that her RFC finding accommodated Mr. Compean's testimony that he needed to elevate his legs after "walking a lot," could sit up to 2 hours before getting up, had unrestricted ability to use his upper extremities, and some difficulty climbing stairs. (R. 68). The ALJ also relied on Mr. Compean's own

-14-

testimony concerning his daily activities.  Id.  The ALJ noted that Mr. Compean testified that he cooks for himself and his mother (who lives on the 2nd floor), shops (he walks to the store and can carry groceries he buys), does dishes and laundry, makes his bed, vacuums and dusts, and takes out the garbage.  Id.  The ALJ also noted that Mr. Compean testified to helping his mother a lot, doing yard work, watching television, and socializing.  Id.

In affirming the ALJ's RFC finding, the Appeals Council expanded on the ALJ's analysis but explicitly considering the effect of Mr. Compean's obesity in combination with his other impairments. (R. 36).  The Appeals Council took into account Dr. Biale's December 2006 assessment that Mr. Compean developed shortness of breath when moving about and difficulty in moving from the sitting to supine position and back up again due to his obesity.  Id.  The Appeals Council noted that upon examination, Mr. Compean's blood pressure was 140/90; respiratory rate was 16 and unlabored; he had full range of motion of all joints; he was able to bear his own weight and his gait was normal; he was able to heel walk and toe walk; he needed no assistive device for ambulation; his motor strength was 5/5 in all extremes; he was oriented times three; he was able to concentrate and maintain attention; and he had no apparent mood or thought disorder.  Id.  The Appeals Council found that Mr. Compean's obesity is a severe impairment and concluded that the ALJ's RFC finding for sedentary work accommodated any limitations that are a result of obesity.  Id.

### 2        Credibility Determination

Mr. Compean next argues that the ALJ failed to adequately explain her credibility determination.  Mr. Compean cites Social Security Ruling 96-7p, which governs credibility assessments in disability claims.  In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by objective medical evidence.  SSR 96-7p.  If not, SSR 96-7p requires the ALJ to consider the entire record, including the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the

claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 416.929(c)(3); SSR 96-7p.

Under SSR 96-7p, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." It is not sufficient for an ALJ to "make a conclusory statements that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p. Moreover, the ALJ may not "simply [] recite the factors that are described in the regulations for evaluating symptoms." SSR 96-7p. At the same time, "[t]he requirement that the ALJ articulate his consideration of the evidence is deliberately flexible." Stein v. Sullivan, 966 F.2d 317, 319 (7th Cir. 1992).

Mr. Compean argues that the ALJ's "decision states that Mr. Compean is not credible, but that the RFC finding accommodates certain limitations that are based on Mr. Compean's testimony." (Doc. 20 at 9). Mr. Compean faults the ALJ for failing to explain "this apparent contradiction." Id. This argument is without merit. In the ALJ's decision, the heading to her credibility finding discussion states that "[t]he claimant is not credible," while in the body of that section of her decision, the ALJ says that Mr. Compean's "statement concerning the intensity, persistence and limiting effects of [his alleged symptoms] are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 67). Reviewing the ALJ's decision as a whole, there is no contradiction. Rice, 384 F.3d at 369 (explaining that a reviewing court will "give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it."). It is evident that the ALJ did not find Mr. Compean to be completely incredible. Presumably, the ALJ meant to say Mr. Compean's allegation of disabling symptoms is not credible. There is nothing

improper or inconsistent about the ALJ finding Mr. Compean to be incredible as to his allegation that he was disabled but credible as to his statements regarding his need to elevate his legs after "walking a lot," ability to sit 2 hours before getting up, unrestricted ability to use his upper extremities, and difficulty climbing stairs. (R. 68); SSR 96-7p (stating "[i]n making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of the individual's allegations to be credible.");

The ALJ concluded that Mr. Compean's impairments could "reasonably be expected to cause the alleged symptoms" but found "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 67). As Mr. Compean acknowledges, the ALJ's RFC finding "accommodates certain limitations that are based on Mr. Compean's testimony." (R. 20 at 9). The ALJ found Mr. Compean's statements that he needs to elevate his legs after "walking a lot" (R. 13), could sit for two hours before getting up (R. 10), has unrestricted ability using his upper extremities, (R. 12) and some difficulty climbing stairs (R. 11-12) were credible.

The ALJ gave specific reasons for discounting Mr. Compean's claim of disability. The ALJ based her credibility determination on the "objective medical findings, medical opinions, treatment history, subjective allegations [and] daily activities." (R. 68). The ALJ reviewed Mr. Compean's medical history, including his hospitalization for an intra-cerebral hemorrhage in August 2006. (R. 66). The ALJ correctly noted that upon discharge, the hemorrhage was "resolved" (R. 722) and that at that time, Mr. Compean had no complications as a result of his diabetes and hypertension. Id. The ALJ then considered the results of the consultative examination by Dr. Biale in December 2006, including that his diabetes and hypertension were under control. Id. The ALJ relied on the January 2007 RFC assessment by Dr. Pilapil, the state agency physician. (R. 68). The ALJ also

explicitly considered and accommodated Mr. Compean's subjective allegations of pain and throbbing in his legs if he walked a lot, his need to get up and move after sitting for an hour or two to get his circulation in his legs going, and his difficulty climbing stairs. Id. Finally, the ALJ considered Mr. Compean's account of his daily activities. Id.

Mr. Compean argues that the ALJ erred in failing to mention his testimony about sleepiness and memory loss. Mr. Compean testified that he had a "lack of memory" as a result of his intracerebral hemorrhage and explained that he had difficulty remembering telephone numbers and birthdays which he did not have trouble remembering before. (R. 9, 18). Mr. Compean also stated that he went to sleep "once in a while" during the day due to boredom or tiredness. (R. 13). He noted that if he sits down to watch television during the day, the majority of the time he will fall asleep. (R. 19). Mr. Compean explained that at night, he slept for three to four hours, awoke to use the bathroom, stayed awake for a three hours, and then slept for another two to three hours. (R. 17). At the hearing, Mr. Compean stated that he planned to get a CPAP machine. (R. 8).

Mr. Compean does not explain how his own statements and testimony about sleepiness and memory loss support a finding of disability. In any event, the record supports the ALJ's failure to include any further limitations caused by Mr. Compean's memory loss and sleep apnea in her RFC assessment. With regard to memory loss, the medical records show that Mr. Compean had some confusion and short-term memory problems during the first few days of his hospitalization at Northwestern Memorial beginning on July 31, 2006. (R. 294, 317, 351, 374, 465). However, beginning on August 4, 2006, Mr. Compean had "no problems with confusion." (R. 460). On August 7, 2006, the day before he was discharged, Mr. Compean reported that he was "near baseline with multi-step directions and had always had some difficulty with short-term memory." (R. 551). After his hospital discharge, Mr. Compean's daughter reported that he had no difficulty with concentration, orientation or confusion. (R. 621). A September 1, 2006 exam revealed that Mr. Compean's mentation was "normal' and he was "doing well with no residual effects" from the

hemorrhage. (R. 657, 664, 690). A December 2006 exam revealed Mr. Compean's "recent and remote memory was intact. He was able to concentrate and maintain his attention span." (R. 669).

Along with the objective medical findings, the ALJ considered the "medical opinions, treatment history, subjective allegations [and] daily activities." (R. 68). No physician opined that Mr. Compean had any memory problems or memory-related limitations. There is no evidence that Mr. Compean sought treatment for memory problems or complained to any physician of any memory problems after this hospital discharge. Lastly, Mr. Compean did not testify that memory problems limited his daily activities of cooking, doing the dishes, doing the laundry, making his bed, vacuuming, dusting, mopping, sweeping, going grocery shopping, helping his mother and watching television. (R. 13-14, 16-17).

Mr. Compean contends that the ALJ also erred in failing to specifically address his testimony regarding sleepiness, but he is wrong. Again, the ALJ is not required to evaluate every piece of testimony. Haynes, 416 F.3d at 626. Despite the ALJ's failure to specifically mention Mr. Compean's testimony regarding sleepiness is it clear that she did in fact consider Mr. Compean's sleep apnea, as she specifically noted that he had a history of sleep apnea (R. 66). Moreover, the ALJ considered Mr. Compean's sleep apnea when she relied on Dr. Pilapil's RFC assessment, which expressly mentioned Mr. Compean's sleep apnea and accounted for it by finding that Mr. Compean should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation etc. and hazards machinery. (R. 675). The ALJ then specifically took Mr. Compean's sleep apnea into consideration in her RFC finding when she found he could perform a range of sedentary work but needed to avoid concentrated exposure to lung irritants and work hazards. (R. 66).

No further limitations concerning Mr. Compean's sleep apnea were warranted. The medical records reveal that Mr. Compean had sleep apnea since at least November 2004. (R. 645). While hospitalized in 2006, Mr. Compean complained of sleep difficulties and a sleep study revealed severe obstructive sleep apnea. (R. 494, 506-08). There is no evidence that Mr. Compean

complained of sleep difficulties after his hospital discharge. Instead, his doctors merely noted Mr. Compean's history of sleep apnea and that he did not have a CPAP machine. (Tr. 708, 715, 721). Mr. Compean told Dr. Biale in December 2006 that he previously had a CPAP machine but it was discontinued. (R. 667). While many doctors noted Mr. Compean's sleep apnea, none opined that the sleep apnea imposes functional restrictions other than avoiding concentrated exposure to lung irritants and work hazards. (R. 675). Finally, Mr. Compean did not testify that his daily activities were impacted by his sleep apnea. Rather, he testified that he slept during the day "once in a while" due to boredom or sleepiness. (R. 13). The ALJ adequately considered the extent of Mr. Compean's sleep apnea in making her credibility and RFC findings.

### 3.    ALJ's Development of the Record

Mr. Compean next argues that the ALJ was required to order a consultative examination to assess his physical and psychological limitations because the latest medical opinion evidence in the record predated the hearing by a little over a year. The hearing was conducted on April 22, 2008, and the latest assessment of Mr. Compean's RFC was that of Dr. Patey on March 22, 2007 affirming the RFC assessment by Dr. Pilapil on January 3, 2007. (R. 700-02).

The ALJ did not err in failing to order further consultative examinations. The ALJ had a duty to fully and fairly develop the record, and she fulfilled that obligation in this case. Smith v. Apfel, 231 F.3d 433, 437 (7th Cir. 2000). The relevant regulation states that an ALJ need not order a consultative examination unless she unable to determine whether the claimant is disabled or, among other situations, when "there is an indication of a change in [the claimant's] condition that is likely to affect [his] ability to work . . . but the current severity of [the] impairment is not established." 20 C.F.R. § 416.919a(b) (stating "[a] consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim."). The Seventh Circuit has held that courts "must respect the authority of administrative officials to decide how much is enough" because "one may always obtain another

medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." <u>Kendrick v. Shalala</u>, 998 F.2d 455, 456-57 (7th Cir. 1993).

The Seventh Circuit has specifically rejected Mr. Compean's contention that the ALJ is required to "update objective medical evidence to the time of [the] hearing." <u>Luna v. Shalala</u>, 22 F.3d 687, 693 (7th Cir. 1994). Although the Commissioner had the burden of proving Mr. Compean's ability to perform a range of sedentary work, it was Mr. Compean's duty "to bring to the ALJ's attention everything that shows that he is disabled." <u>Id</u>. "This means that [Mr. Compean] must furnish medical and other evidence that the ALJ can use to reach conclusions about his medical impairment and its effect on his ability to work on a sustained basis." <u>Id</u>.

Mr. Compean asserts that a consultative examination should have been ordered because his testimony at the hearing suggested that his condition "may have worsened." (R. 27 at 5). Mr. Compean points out that he testified that he was "now" having trouble remembering birthdays and telephone numbers. (R. 18). Mr. Compean also says that his testimony as to his sleep apnea, paresthesias in his extremities, and throbbing in his feet "suggested some changes since the medical opinions were rendered." <u>Id</u>. Mr. Compean argues that these conditions could have caused additional limitations since the latest opinion evidence.

Mr. Compean's argument is not persuasive. The evidence in the record was sufficient for the ALJ to determine that Mr. Compean is not disabled for the period between October 16, 2006 and June 24, 2008. The ALJ had the benefit of the opinions of two state agency physicians and Dr. Biale's consultative report as well as records from Mr. Compean's hospitalization for his intracerebral hemorrhage. As for sleep apnea, the state agency physicians who assessed Mr. Compean's RFC were aware of Mr. Compean's sleep apnea and determined that he retained the ability to perform sedentary work with no exposure to concentrated lung irritants and work hazards. The ALJ accepted these limitations and included them in her RFC findings.

Moreover, Mr. Compean's suggestion that his sleep apnea, paresthesias in his extremities, and throbbing in his feet could have caused additional limitations since the latest opinion evidence which were not accommodated by the ALJ in her RFC finding is not supported by his own testimony. Mr. Compean's statements regarding his sleep apnea fails to suggest that his symptoms had worsened to the point that he was unable to work. Mr. Compean stated the he went to sleep "once in a while" during the day due to tiredness or boredom. (R. 13). With regard to throbbing in his feet, the ALJ accepted Mr. Compean's testimony regarding his need to elevate his legs if he walked "a lot" by limiting him to sedentary work with a sit/stand option "at will." (R. 68). Mr. Compean's testimony regarding tingling and numbness in his hands does not suggest that his symptoms had worsened to the point that he was unable to perform a limited range of sedentary work. Mr. Compean testified at the hearing that he had no difficulty using his hands or reaching overhead or in front. (R. 12).

Mr. Compean also argues that the ALJ improperly failed to order a consultative psychological exam because there was evidence in the record which raised the "possibility" of ongoing brain abnormalities and there was no assessment by a mental health professional in the record. (R. 20 at 10). Mr. Compean points to two pieces of evidence in the record to suggest that he had "ongoing abnormalities in the brain" following his hemorrhage: (1) a August 3, 2006 speech pathology evaluation finding that Mr. Compean "demonstrated mild-moderate cognitive-communication difficulties characterized by reduced short-term memory, difficulty with problem-solving and reduced auditory processing" and (2) Disability Report - Field Office dated October 16, 2006 indicating that Mr. Compean had difficulty with understanding and coherency and that interview questions had to be repeated various times. (R. 144, 294). Mr. Compean also relies on his hearing testimony that he was "now" having trouble remembering birthdays and telephone numbers. (R. 18).

The ALJ was also under no duty to order a consultative psychological exam. The isolated pieces of evidence cited by Mr. Compean do not suggest that his memory prevents him from performing substantial gainful activity. Proof of a mental impairment must be established by "medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 416.908. There is no objective medical evidence of memory problems after Mr. Compean's hospital discharge in August 2006. A cognitive evaluation on August 7, 2006 noted that Mr. Compean had always had some difficulty with short-term memory but he was near baseline with multi-step directions following his hemorrhage. (R. 551). After the speech therapist reviewed strategies with Mr. Compean to compensate for decreased short-term memory, he answered moderately complex yes/no questions accurately 90% of the time, followed three step commands without repetition 80% of the time, recalled a list of three words after short delay 100% of the time, and provided the best solution to a functional problem 90% of the time. (R. 552). A September 1, 2006 exam revealed that Mr. Compean's mentation was normal and he was "doing well" with no residual effects from his hemorrhage. (R. 657, 658). A December 18, 2006 mental status examination by Dr. Biale found: Mr. Compean "alert and oriented times three. His recent and remote memory intact. He was able to concentrate and maintain his attention span." (R. 669). In addition, Mr. Compean's daughter reported that he had no difficulty with concentration, orientation or confusion on August 9, 2006. (R. 621).

Mr. Compean and his counsel presented no other evidence of a mental impairment. With one exception during his hospitalization for his hemorrhage, there is no objective evidence of a mental health diagnosis or treatment. (R. 202) (stating Mr. Compean "verbalizes depression and does not know which health issues to tackle first."). A September 1, 2006 evaluation revealed no psychological symptoms. (R. 656). On December 18, 2006, Dr. Biale noted that Mr. Compean "had no apparent mood or thought disorder." (R. 668). The medical records do not reveal mental health complaints or symptoms. The ALJ had sufficient evidence with which to make a disability

decision and she did not error in failing to order a consultative mental examination. Howell v. Sullivan, 950 F.2d 343, 349 (7th Cir. 1991) (holding ALJ was under no duty to order a consultative examination where there was no objective evidence to support claimant's complaints of depression and alcoholism).

### 4.    The Grids

Mr. Compean's final argument is that the "Appeals Council erred to the extent that it relied on the grid alone to deny the claim prior to age 50 at step five." (Doc. 20 at 8, n.6). The grid is a chart which classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). If use of the grid is appropriate, the grid alone constitutes substantive evidence sufficient to support the decision of the Commissioner. Id. However, "use of the grid may be inappropriate if the claimant suffers from severe non-exertional impairments, including pain, which prevent the claimant from performing the work indicated by the grid." Id. at 640-41. When a claimant suffers from a non-exertional limitation which might substantially reduce the range of work which he can perform, the ALJ must consult a vocational expert. Luna, 22 F.3d at 691.

As the Commissioner argues, the ALJ appropriately used the grid as a framework for decisionmaking with the assistance of a vocational expert. The ALJ noted that the grids directed a finding of "not disabled" based upon Mr. Compean's residual functional capacity, age, education, and work experience. (R. 69) (stating "[i]f the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 201.25."). Mr. Compean is correct that his need to alternate between sitting and standing at will is a significant nonexertional limitation which precludes use of the grids without relying on the testimony of the VE. Borski v. Barnhart, 33 Fed.Appx. 220, 224-25 (7th Cir. 2002) (noting that the need for a sit/stand option "takes the case out of the grid and requires the input of a vocational expert."). The ALJ found that Mr. Compean's nonexertional limitations significantly

impacted his ability to perform the full range of sedentary work, stating: "[h]owever, [Mr. Compean's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."  (R. 69).  The ALJ then asked the VE whether jobs exist in the national economy for a hypothetical individual with Mr. Compean's age, education, work experience, and residual functional capacity.  Id.  The Appeals Council affirmed the ALJ's RFC finding limiting Mr. Compean to reduced range of sedentary work.  The Appeals Council then relied on the grids as a "framework" to find Mr. Compean not disabled prior to his 50th birthday, stating "[p]rior to June 25, 2008, an individual who has the educational and vocational factors described above and who has the residual functional capacity to perform a reduced range of the sedentary exertional level [work] is found to be not disabled *within the framework* of Rule 201.25." (R. 36) (emphasis added).  The Appeals Council thus affirmed the ALJ's finding at step five for the period before June 25, 2008. Id.  Because the ALJ properly relied on the VE's testimony at step five and the Appeals Council affirmed that step five denial of benefits for the period before Mr. Compean's 50th birthday, the Appeals Council decision finding that Mr. Compean was not disabled prior to his 50th birthday is supported by substantial evidence.

## CONCLUSION

Although the ALJ's decision could have been better organized and she could have been more thorough in her analysis, the ALJ considered the important evidence and gave reasons based on substantial evidence in the record from which the Court could trace the path of her reasoning. The final decision of the Commissioner is therefore affirmed.  Mr. Compean's Motion for Judgment on the Pleadings [19] is denied and the Commissioner's Cross-Motion for Summary Judgment [22] is granted.  The Clerk is directed to enter judgment in favor the Commissioner and against Plaintiff Robert Compean.

**E N T E R:**

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated:  March 28, 2011**